Filed 3/5/13  Diaz v. Los Angeles County MTA CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| EDUVIGIS DIAZ,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY et al.,<br><br>    Defendants and Respondents. | B236856<br><br>(Los Angeles County<br>Super. Ct. No. LC075998) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Michael A. Latin, Judge.  Affirmed in part, reversed in part and remanded with directions.

Marlon M. Alo for Plaintiff and Appellant Eduvigis Diaz

O'Reilly & McDermott, Paul O'Reilly; Greines, Martin, Stein & Richland, Martin Stein and Carolyn Oill for Defendants and Respondents Los Angeles County Metropolitan Transportation Authority and Omar Forero

_____

Eduvigis Diaz appeals from the judgment entered in this personal injury action after a jury found the Los Angeles County Metropolitan Transportation Authority (MTA) and its employee, Omar Forero (collectively MTA defendants), negligent in connection with injuries Diaz sustained while a passenger on an MTA bus. Diaz contends the trial court erred in denying her motion for summary judgment. She also challenges several of the trial court's evidentiary rulings, contends the jury's damage award of $15,175 was insufficient as a matter of law and asserts the court committed misconduct by improperly questioning witnesses at trial. We reverse the trial court's order taxing costs on appeal and affirm in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Accident and This Lawsuit*

Diaz was a passenger on an MTA bus driven by Forero on November 21, 2005. As the bus approached the intersection of Van Nuys Boulevard and Roscoe Boulevard, it braked suddenly and hit the back of the car driven by Cindy Artero. Diaz, then 79 years old, fell off her seat and hit her head, sustaining injuries.

Diaz sued the MTA defendants claiming her injuries were caused by Forero's negligence. The MTA defendants asserted Forero had behaved reasonably and it was Artero who had caused the accident by suddenly cutting in front of Forero from the adjacent lane.

### 2. *The First Trial and Appeal*

At the first trial the jury found in favor of the MTA defendants. Diaz appealed, arguing the trial court had erred in failing to give a res ipsa loquitor instruction to the jury. We agreed, holding that, under long-standing Supreme Court authority (see *Hardin v. San Jose City Lines, Inc.* (1953) 41 Cal.2d 432), when a passenger on a common carrier, through no fault of his or her own, is injured in connection with the operation of the carrier's vehicle, the plaintiff is entitled to a res ipsa loquitor instruction that creates a rebuttable presumption of negligence and initially shifts the burden to the common carrier to demonstrate the absence of negligence. (See *Diaz v. Los Angeles County Metropolitan Transportation Authority* (July 20, 2009), B206259, opn. ordered nonpub. Oct. 22, 2009.)

2

Finding the error prejudicial, we reversed the judgment and remanded to the trial court for further proceedings. (*Ibid.*)

3. *Diaz's Summary Judgment Motion*

Diaz moved for summary judgment or, alternatively, summary adjudication, contending there was no evidence to rebut the presumption of negligence. Diaz claimed $32,440 in special damages for past and future medical expenses and requested the court award her additional, unspecified general damages for pain and suffering "as allowed by law."

In their opposition papers the MTA defendants argued there were triable issues of material fact as to whether Artero alone was negligent and had caused the accident. They supplied evidence Forero was 120 feet from the intersection and driving at a speed of 25 miles per hour prior to the collision. He was covering his brakes in accordance with his safety training in case the light changed when Artero's car suddenly cut in front of him and then stopped abruptly as the light turned yellow. Artero's unsafe lane change and sudden stop forced Forero to apply his brakes hard. He ultimately ended up hitting Artero's vehicle.

The trial court denied the motion concluding there were triable issues of material fact as to whether the MTA defendants were negligent.

4. *The Second Jury Trial and Special Verdict*

After each side presented evidence at a second trial, the jury in a special verdict found the MTA defendants negligent, apportioning fault for the accident 50 percent to Forero and 50 percent to Artero. Diaz was awarded $7,675 in past medical expenses and $7,500 in past noneconomic loss including physical pain and mental suffering. The jury awarded no damages for future medical expenses or future noneconomic loss.

5. *Diaz's Motion for a New Trial or Judgment Notwithstanding the Verdict*

Diaz moved for a new trial or, in the alternative, judgment notwithstanding the verdict. She argued the evidence was insufficient to justify the verdict; the damages were inadequate as a matter of law; and the court had made several errors of law to which she objected at trial, including instructing the jury with the evidentiary presumption of res

3

ipsa loquitor in CACI No. 417 rather than in accordance with language contained in Evidence Code section 646 as she had requested.  The trial court denied both motions.

## DISCUSSION

### 1. *Any Alleged Errors Relating to Issues of Liability Were Harmless*

At the threshold, Diaz raises several arguments relating solely to the question of the MTA defendants' negligence.  She asserts the court erred in sustaining objections to questions directed to Merlyn Wilson, a former California Highway Patrol Officer in charge of accident investigation, who opined on the question whether Forero had behaved negligently.  She also insists the court committed prejudicial error by instructing the jury with CACI No. 417, the res ipsa loquitor instruction approved by the Judicial Council, arguing the CACI instruction fails to "adequately state the presumption of negligence" or shift the burden to the MTA defendants to show Forero was not negligent.

Because Diaz prevailed on the issue of liability, she cannot demonstrate the court's rulings were prejudicial.  Accordingly, we do not consider the merits of her arguments directed solely to questions of negligence.  (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]; Code Civ. Proc., § 475 ["[n]o judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also by reason that such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed"]; Evid. Code, §§ 353, 354 [verdict or finding shall not be set aside or reversed for evidentiary error unless it resulted in miscarriage of justice]; see also *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570 [instructional error in civil case is harmless when "it is not reasonably probable [the aggrieved party] would have obtained a more favorable result in its absence"].)

4

2. *The Trial Court Did Not Err in Denying Diaz's Motion for Summary Judgment or, in the Alternative, Summary Adjudication*

Diaz contends the trial court erred in denying her motion for summary judgment or, in the alternative summary adjudication, because the evidence submitted with the motion established the MTA defendants were negligent as a matter of law and Diaz was entitled to the damages she requested. The motion was properly denied; Diaz failed to meet her initial burden on summary judgment. (See Code Civ. Proc., § 437c, subds. (a) ["[a]ny party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding"]; (p)(1) ["a plaintiff or cross-complainant has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action"].)

Damages are an essential element of a negligence cause of action. (See *Merrill v. Navegar*, *Inc.* (2001) 26 Cal.4th 465, 500 [elements of negligence action are duty, breach, causation and damages].) Yet, Diaz did not specify in her motion the amount of damages incurred. Although she identified special damages, mainly past and future medical expenses, her motion requested the trial court operate as fact-finder and fix the amount of general damages to be awarded as allowed "under the law." For this reason alone, the motion for summary judgment was properly denied. (See *Pajaro Valley Water Management Agency v. McGrath* (2005) 128 Cal.App.4th 1093, 1106 [plaintiff cannot "establish a prima facie entitlement to summary judgment without showing both the fact *and the amount* of damages"]; *Department of Industrial Relations v. UI Video Stores, Inc.* (1997) 55 Cal.App.4th 1084, 1097 ["[b]ecause issues of the calculation of damages apparently remain to be determined, it is not appropriate to grant summary judgment"]; *Lerner v. Ehrlich* (1963) 222 Cal.App.2d 168, 173 [same]; see generally *Saldana v. Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1513 ["[r]eview of a trial court's determination [on summary judgment] involves pure matters of law, requiring reassessment of the legal significance of the documents"].)

5

To the extent Diaz contends the court should have at least granted summary adjudication on the question of Forero's negligence, that is, whether Forero breached his duty of reasonable care, this too would have been improper. At the time of Diaz's motion, summary adjudication was authorized only if it "completely dispose[d] of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1).)[1] Thus, while a defendant could properly move for summary adjudication on the question of breach because negating that element would dispose of the cause of action, a plaintiff could not because it would not resolve the cause of action or meet the other requirements of Code of Civil Procedure section 437c, subdivision (f)(1). (*Ibid.*) In any event, the jury ultimately found in Diaz's favor on the question of negligence. Thus, as we have explained, even if the trial court erred, its denial of summary adjudication on the question of Forero's negligence was plainly harmless. (See *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833 [error in denying summary judgment cannot result in reversal following trial on the merits unless error was prejudicial; prejudice is not shown merely by fact that entry of summary judgment would have avoided a trial].)

3. *Any Evidentiary Errors Were Harmless*

     a. *Rulings relating to expert witness testimony*

Diaz contends the court erred in sustaining hearsay objections to questions directed to her expert witnesses, Dr. Kiana Kiasaleh, Dr. Stanley Goodman and Donna Pope, each of whom testified on the issue of damages. Diaz has failed to demonstrate any reversible error.

---

[1]    After the trial in this action, Code of Civil Procedure section 437c was amended, effective January 1, 2012, to permit a party to move for summary adjudication of a legal issue notwithstanding the limitations of subdivision (f), provided the parties submit a joint stipulation identifying the issue to be decided and declaring that a ruling on the issue will further the interests of judicial economy and the court approves the stipulation. (See Code Civ. Proc., § 437c, subd. (s)(1)-(4); Stats. 2011, ch. 419, § 3.)

### i. *Dr. Kiasaleh*

Dr. Kiasaleh, Diaz's treating chiropractor, testified she referred Diaz to a neurologist for a video electronystagmography (VENG) test to help diagnose Diaz's balance problems. Diaz's counsel asked Dr. Kiasaleh the amount of the neurologist's invoice. The trial court sustained the MTA defendants' objection on hearsay grounds because Dr. Kiasaleh did not prepare the invoice. No other evidence was presented that Diaz had incurred an additional $2,600 in medical expenses.

Diaz argues the objection to Dr. Kiasaleh's testimony should not have been sustained because experts may rely on hearsay in formulating their opinions. (See *In re Fields* (1990) 51 Cal.3d 1063, 1070 [an expert may base an opinion on hearsay and other inadmissible matter provided there exists reasonable basis for the particular opinion offered]; *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 [same].) While true, the argument misses the point. The information on the invoice, which Dr. Kiasaleh apparently neither prepared nor directed to be prepared concerning a test she was not medically qualified to administer, was inadmissible hearsay in the absence of a proper foundation that it was a business record (See, e.g., Evid. Code, § 1271.) Diaz attempted to have Dr. Kiasaleh testify as to the amount charged for the test to prove an element of her damages—that is, for the truth of the information contained in the invoice—not as part of the basis for Dr. Kiasaleh's opinions. Indeed, the trial court permitted Kiasaleh to opine on Diaz's condition as an expert in chiropractic medicine, as well as on the cost of Dr. Kiasaleh's treatment of Diaz and whether those chiropractic costs were reasonable. The trial court's ruling was entirely proper.

### ii. *Dr. Goodman*

Dr. Goodman, an expert in geriatric psychiatry, opined Diaz had developed major depressive disorder as a result of the accident. Dr. Goodman explained he based his opinion in part on his interview with Diaz, as well as on Diaz's medical records, which did not indicate she suffered from any psychiatric disorder prior to the accident.

Diaz contends the court erred in prohibiting Dr. Goodman from testifying whether Diaz's treating physician had ever referred her to a psychiatrist.[2] Diaz argues Dr. Goodman should have been able to refer to Diaz's medical records, on which he had relied to formulate his expert opinion, to answer that question. She is correct to the extent the question was directed to the basis for Dr. Goodman's opinion that Diaz had developed a major depressive disorder as a result of the accident. However, it appears Diaz was attempting to use Dr. Goodman's testimony to establish that Diaz had, in fact, never been referred to a psychiatrist prior to the accident. Therefore, the trial court's evidentiary ruling was technically correct. Dr. Goodman's testimony would have been inadmissible hearsay to prove that historic fact. In any event, during another part of his examination Dr. Goodman testified, based on her medical records, Diaz's treating physician had not referred Diaz to a psychiatrist. Dr. Goodman repeated this testimony on cross-examination. Thus, Diaz has not demonstrated any prejudicial error.

### iii. *Donna Pope*

Donna Pope, a registered nurse and geriatric case manager, prepared a life care plan assessing the costs of Diaz's future medical needs. Pope testified, in preparing the life care plan, she had interviewed Diaz and her family and reviewed her medical records from her treatment providers. Pope learned Diaz suffered from memory impairment, mild traumatic brain injury, vertigo, post-traumatic stress disorder and severe depression. Based in part on her interviews with Diaz and her family and her review of Diaz's medical records, Pope opined Diaz would need $57,437 each year for the rest of her life and explained she estimated a future life expectancy of approximately seven years in arriving at Diaz's total medical needs valuation.

---

[2] Diaz's counsel asked Dr. Goodman whether "Dr. Vargas, as [Diaz's] treating physician, refer[red] her to a psychiatrist." The court interjected, "That would be hearsay. Can't answer one way or another, because he wasn't there to hear the conversations that Dr. Vargas had with her way back in 2005 and before that." When Diaz's counsel explained he expected Dr. Goodman to refer to Diaz's medical records to answer the question, the court stated, "That doesn't matter. You're asking a question that directly calls for hearsay."

8

Diaz contends the court improperly precluded Pope from testifying, as hearsay, regarding conversations she had had with Drs. Goodman and Kiasaleh or relying on their reports. Diaz misapprehends the court's rulings, which were directed to the form of the questions, not to the witnesses' ability to rely on hearsay in formulating an opinion. For example, Diaz's counsel asked Pope whether Dr. Goodman had said Diaz would need future psychiatric treatments. The form of the question called for hearsay. In contrast, when counsel inquired whether Pope had relied on the reports of Drs. Kiasaleh and Goodman in reaching her opinion, Pope was permitted to answer.

Diaz also cites a portion of the transcript where Pope was asked again, on redirect examination by Diaz's counsel, what she had relied on in reaching her conclusions. The court stated, "The question calls for hearsay. You're just asking her to regurgitate what she read in somebody else's report. Hearsay. The court is going to sustain its own objection." Although the court's objection and ruling were erroneous—the question called for the witness's expert opinion, which may be based on hearsay sources (see *In re Fields, supra,* 51 Cal.3d at p. 1070) —Pope had already testified to matters she relied on in reaching her conclusion. Drs. Goodman and Kiasaleh also testified as to their opinions, which Pope explained she had relied on in formulating her life care plan. Thus, any error here could not be prejudicial. (Evid. Code, § 354; see *Diaz v. Carcamo* (2011) 51 Cal.4th 1148, 1161 [reversal warranted for improper admission or exclusion of evidence in civil case only if appellant establishes it is reasonably probable jury would have reached result more favorable to appellant absent the error]; *In re Marriage of McLaughlin* (2000) 82 Cal.App.4th 327, 337 [appellant's burden to demonstrate error is prejudicial and resulted in miscarriage of justice].)

b. *Ruling excluding former testimony of out-of-state witnesses*

Diaz's daughter, Bianca Diaz, and Diaz's grandson, David Gonzales, testified at the first trial. Sometime thereafter they moved to, and became residents of, Arizona. The trial court did not allow Diaz to read portions of their prior testimony into evidence because she failed to show she had exercised reasonable diligence in attempting to procure their attendance at trial. (Evid. Code, § 240, subd. (a)(5) [witness is unavailable

9

if he or she is absent from hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process].) Diaz contends this was error because, as residents of Arizona, Gonzalez and Bianca Diaz were beyond the court's process and thus by definition statutorily unavailable. (See Evid. Code, § 240, subd. (a)(4) [declarant is unavailable if absent from hearing and court is unable to compel his or her attendance by its process]; see also Code Civ. Proc., § 1989 [witness not obliged to attend hearing unless he or she is a resident within the state at the time of service].)

We need not decide which definition of unavailability the court should have applied because Diaz failed to demonstrate her daughter and grandson were unavailable under either Evidence Code section 240, subdivision (a)(4) or (a)(5). Indeed, there was no showing, or even representation to the court, that Bianca Diaz and her son had not visited California within a reasonable time prior to trial and thus were, at all reasonable times, "beyond the court's process." In any event, Diaz has not established the exclusion of their testimony was prejudicial. Bianca Diaz had testified her mother was independent before the accident, but afterward suffered balance problems and walked with a cane. She also complained of pain in her back and in her head, pain she did not complain of prior to the accident. David Gonzalez's testimony was essentially the same. This evidence was entirely cumulative. Diaz's expert witnesses, Pope, Dr. Goodman and Dr. Kiasaleh, testified Diaz only complained to her treating physicians of pain or balance issues after the accident. Accordingly, even if there were error, it is not reasonably probable Diaz would have received a more favorable verdict had the testimony of those witnesses been received. (See *Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2009) 176 Cal.App.4th 1249, 1255 [where excluded evidence was merely cumulative or corroborative of other evidence in record, it is not "reasonably probable a more favorable result would have been reached absent the error"]; *Patricia C. v. Mark D.* (1993) 12 Cal.App.4th 1211, 1220 [same].)

10

c. *Ruling excluding Diaz's former testimony*

Diaz's counsel also sought to introduce Diaz's testimony from the prior trial, asserting her memory problems had worsened and Diaz was too mentally infirm to testify. (See Evid. Code, § 240, subd. (a)(3) [a person is unavailable for purposes of testifying if he or she is "[d]ead or unable to attend or to testify at the hearing because of then-existing physical or mental illness or infirmity"]; *People v. Alcala* (1992) 4 Cal.4th 742, 778 [upholding trial court's finding following witness's testimony at pretrial hearing that witness suffered from Alzheimer's disease and thus was unavailable to testify].) The trial court denied the request, noting Diaz's counsel had failed to make a proper foundation that she was too mentally infirm to testify.[3]

Emphasizing Dr. Kiasaleh's testimony that Diaz suffered from memory problems and, at their last meeting in 2010, did not recognize Dr. Kiasaleh or recall the treatment she had provided, Diaz argues she established a sufficient foundation she was unavailable due to mental infirmity. We need not belabor this contention. The totality of the former testimony sought to be introduced was that Diaz, with her recollection refreshed by a photograph of her on a hill in Columbia, recalled taking a trip to her native country three months before the accident and climbing on a rock unassisted. The exclusion of this small portion of Diaz's prior testimony has not been shown to be prejudicial.

---

3      The request to use Diaz's prior testimony, like the request to introduce the prior testimony of her daughter and grandson, was not made until Diaz had otherwise concluded the presentation of her case and the defense indicated it could complete its case the same day. Faced with the trial court's ruling, Diaz's counsel requested a continuance to allow him to question Diaz the next day and lay the requisite foundation, explaining he thought Diaz's presence at trial would not be required in light of statements the court had made at pretrial settlement conferences. The court denied the request. The court noted it had merely highlighted at a pretrial conference the toll a trial could take on an elderly witness. It did not make a finding on her unavailability. Diaz does not challenge the court's denial of the request for a continuance.

11

4. *The Jury's Decision Not To Award Any Future Damages Is Supported by Substantial Evidence*

"Appellate review of a fact finder's award of damages is limited. [Citation.] In the absence of error in the admission of testimony supporting a claim of economic damages . . . we will affirm the judgment if substantial evidence supports the damage award. [Citation, fn. omitted.] 'Damages, even economic damages, are difficult to measure in personal injury cases. There may be disputed facts regarding the amount of medical expenses or lost wages, or disputed inferences about the probable course of events such as the length of incapacitation or whether a continuing disability will worsen, pleateau, or improve.' [Citation.] 'Technical arguments about the meaning and effect of expert testimony on the issue of damages are best directed to the [fact finder.]'" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1321-1322 (*Pannu*); accord, *Abbott v. Taz Express* (1998) 67 Cal.App.4th 853, 856.)

To determine whether a damages award is supported by substantial evidence, "we "must start with the presumption that the record contains evidence sufficient to support the judgment; it is appellant's burden to demonstrate otherwise." (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 368; accord, *Pannu, supra,* 191 Cal.App.4th at p. 1322, fn. 18.) "'Under that standard, we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment.' [Citation.] 'It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.'" (*Pannu,* at p. 1322, fn. 18; accord, *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)

Diaz contends there was uncontradicted evidence she required future medical care "to a reasonable certainty" and argues the jury was required to award her at least some future damages even if there was conflicting evidence about the amount. Although Diaz

12

cites the testimony of Pope and her medical providers to support this assertion,[4] she ignores contrary evidence that is fatal to her claim. For example, there was evidence Diaz suffered from diabetes and expert testimony that people with diabetes may suffer from dizziness and unsteadiness similar, or even identical to, the symptoms Diaz purportedly suffered as a result of the accident. The jury could have found Diaz's need for future medical care was not caused by the MTA defendants' negligence, but her advanced age and health conditions unrelated to the accident. Moreover, although Dr. Kiasaleh testified as to Diaz's future medical needs, when confronted on cross-examination with her notes discharging Diaz in April 2006, she admitted she believed Diaz's injuries from the accident had resolved at that time. As for psychiatric therapy, there was evidence Diaz needed help for clinical depression following the accident, but conflicting evidence as to whether the accident, as opposed to her advanced age and associated medical problems unrelated to the accident, had caused the depression. Simply stated, for a variety of reasons supported by the evidence, the jury could have found Diaz was not entitled to any future damages. The record amply supports the jury's verdict. (See *Abbott v. Taz Express, supra,* 67 Cal.App.4th at p. 855 ["[B]etween black and white are various shades of gray, and all of the colors of the rainbow as well. What constitutes fair and reasonable compensation in a particular case is a question of fact . . . ."]; *Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 321 [same].)

5. *Diaz Has Not Demonstrated Prejudicial Judicial Misconduct*

Diaz contends the trial court engaged in prejudicial misconduct by asking questions that effectively "misrepresented evidence" (implying Diaz suffered from Alzheimer's disease) and were designed to induce witnesses to alter their testimony and bolster the defense case. By failing to object to any of the court's questions, Diaz has not preserved the issue for appeal. (See *People v. Cook* (2006) 39 Cal.4th 566, 598 [failure

---

4        Based on her research and the diagnoses and treatment plans of Diaz's various medical providers, and using a life expectancy of 6.79 years, Pope estimated future health care costs at $389,997, increasing that total to as much as $706,362 if in-patient residential treatment was assumed.

to object to court's questions of witnesses at trial results in forfeiture of objection on appeal]; *People v. Harris* (2005) 37 Cal.4th 310, 350 ["Defendant argues the court overstepped its bounds with respect to the tone, form and number of questions posed. However, he did not object to the trial court's questioning, thus making the claim not cognizable on appeal"].)

Diaz insists any objection would have been futile because the very comments she identifies as misconduct show the court was inherently biased against her and her attorney. (See *People v. Sturm* (2006) 37 Cal.4th 1218, 1237 ["As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudiced caused by' such misconduct, or when objecting would be futile."]; see also *ibid.* [where trial court belittled crucial defense witnesses, hamstrung their testimony, and repeatedly disparaged defense counsel, appellate claims of judicial misconduct were not forfeited by failure to object at trial; "[g]iven the evident hostility between the trial judge and defense counsel during the penalty phase, it would also be unfair to require defense counsel to choose between repeatedly provoking the trial judge into making further negative statements about defense counsel and therefore poisoning the jury against his client or, alternatively, giving up his client's ability to argue misconduct on appeal"].) The court's questioning in this case was at times aggressive, and it occasionally overstepped its bounds by straying from the ideal of """temperate, nonargumentative, and scrupulously fair."" (*People v. Cook, supra,* 39 Cal.4th at p. 597.) Nonetheless, the court did not manifest such hostility as to entirely excuse Diaz's counsel from his obligation to object, at least at some point in the trial, to comments and questions he now identifies as biased.[5] In addition, even considering the issue on its merits, we find no prejudicial misconduct.

---

[5] Although Diaz's counsel complained generally at a side bar following Dr. Goodman's testimony about the court's evidentiary rulings and inquired whether he had done something to offend the court, he did not articulate any objection to the form

14

### a. *Governing law*

"A trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook, supra,* 39 Cal.4th at p. 597; see Evid. Code, § 775 ["[t]he court, on its own motion or on the motion of any party, may call witnesses and interrogate them the same as if they had been produced by a party to the action, and the parties may object to the questions asked and the evidence adduced the same as if such witnesses were called and examined by an adverse party"]; *People v. Carlucci* (1979) 23 Cal.3d 249, 256 [Evid. Code, § 775, a codification of case law, "'confers upon the trial judge the power, discretion and affirmative duty . . . [t]o participate in the examination of witnesses whenever he [or she] believes that he [or she] may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his [or her] right of explanation, and in eliciting facts material to a just determination of the cause'"].)

### b. *The court's questions regarding Alzheimer's disease*

During Diaz's counsel's examination of Dr. Goodman, the court inquired whether Diaz suffered from Alzheimer's disease. During this colloquy the court stated, "There is some form of Alzheimer's or dementia in varying stages in almost 50 percent of the population in those people 85 years old; is that a correct statement?" The court went on to ask, "And there is no case in documented history, is there, where a person was found to have Alzheimer's as the direct result of a fender bender in a car, is there?" Dr. Goodman agreed with both statements. The court then asked, "Is there any link between head trauma and the immediate onset of Alzheimer's in any published study that you can point me to?" Dr. Goodman responded there was not, to his knowledge, but explained he had diagnosed Diaz with memory problems from traumatic brain injury, not Alzheimer's. The court replied, "But she has Alzheimer's correct? Her life care plan is based on it."

---

and substance of the court's own questions and comments sufficient to preserve the misconduct issue on appeal.

"[Do] you see the word 'Alzheimer's' all over the life care plan and . . . , more importantly, the vast majority of expenses in the life care plan, right?" Dr. Goodman then explained Alzheimer's is mentioned in the life care plan because the assisted living Alzheimer's dementia unit is a program that can help people with memory-disorders, but, to his knowledge, Diaz was never diagnosed with Alzheimer's.

The record reflects that defense counsel first suggested Diaz suffered from Alzheimer's disease unrelated to the accident: During cross-examination of Pope, which immediately preceded Dr. Goodman's testimony, counsel for the MTA defendants observed Pope's life care plan included substantial costs for treatment at an Alzheimer-dementia center. Pope admitted she had no information about whether Diaz suffered from Alzheimer's disease at all, much less whether the accident had exacerbated the condition.

Pope's testimony concerning the life care plan she prepared arguably provided some slight evidentiary basis for the court to inquire whether Diaz suffered from Alzheimer's disease. Based on the court's question, Dr. Goodman was able to explain that the references to Alzheimer's in the life care plan were based, not on any actual diagnosis, but on the best therapeutic vehicle to assist Diaz. At least, however, the tone and form of the court's questions could have been more circumspect. Nonetheless, the court's questions did not reflect an inherent bias or deny Diaz the right to a fair trial.

c. *The court's questions to Pope and Marianne Inouye*

Diaz contends the court's questions to Pope and to economist, Marianne Inouye, criticized Diaz's efforts to recover damages through litigation and undermined the merit of her claims. The record does not support the assertion. Asked on cross-examination what investigation she undertook to determine whether Diaz's unsteady gait was the result of the accident, Pope responded she relied, at least in part, on Diaz's representation she did not suffer from dizziness or vertigo prior to the accident. Pope explained, "I have to go by that: she said that she did not have it before and that it caused her a problem with her balance." The court interjected, "Ms. Pope, when you're talking to this person, you know you're talking to them in the course of litigation, right? . . . And you know that

16

their objective in the litigation is that they are seeking money, right? . . . So, you're saying that when you question them you don't go behind what they claim? You just follow whatever they say and you take that as the truth, and you don't question it at all?" When Pope explained it was her duty to be an advocate for the patient, the court interjected, "You have a different role when you come to court. In court, you are not to be an advocate for anybody. You're just a witness sworn to tell the truth and to answer the questions directly and honestly. That's your only obligation. Any obligation that you perceive to conflict with that case should be put out the window. Just tell the truth. Be objective. Okay?" Again, we certainly do not commend the tone or phrasing of these questions and comments, but they did not disparage Pope or Diaz. Rather, they were directed to the factors Pope relied on, and did not rely on, in formulating Diaz's life care plan. (*People v. Carlucci, supra,* 23 Cal.3d at p. 256; Evid. Code, § 775.) The court's admonition to respond truthfully to questions, even if that interfered with her perceived role as Diaz's advocate, was not improper.

The court's questions to Inouye were similarly intended to elicit the facts on which she based her opinion. When Inouye testified she relied solely on the life care plan in formulating her opinion, the court inquired, "What if none of [the information in the life care plan] is true?" Inouye explained her role was not to determine the truth or accuracy of the future medical needs itemized in the life care plan, but only to determine the present value of those damages as represented to her. The court's clarifying questions to Inouye simply highlighted Inouye's limited role in reviewing the life care plan. They were not improper.

d. *Other questions and comments by the trial court*

Diaz highlights several other comments and questions by the trial court that she contends reflected a bias against her and her counsel and undermined her case for damages: For example, when questioning Dr. Goodman, the court referred to the accident as a "fender bender," minimizing the seriousness of Diaz's claim that the accident caused her substantial damages. That comment was improper. Its impact, however, was immediately mitigated when Diaz's counsel asked Dr. Goodman whether

17

he viewed the accident as a fender bender, and Goodman said he did not. More importantly, the jury was properly instructed not to take any of the court's comments as evidence. We presume the jury properly followed these instructions. (*People v. Holt* (1997) 15 Cal.4th 619, 622 ["[j]urors are presumed to understand and follow the court's instructions"]; *People v. Yeoman* (2003) 31 Cal.4th 93, 139 [same].)

When Dr. Goodman referred to a diagnostic tool called a "Beck test" to identify depression, hopelessness and suicidal ideations, defense counsel jokingly asked whether there was a Mrs. Beck. The court responded, "How do you know the Beck in the test isn't Mrs. Beck?" Diaz argues the court was ridiculing her witness; not so. Attempts by the court to introduce levity into the trial are generally not well-advised, but the comment here was not directed to Dr. Goodman or to his credibility. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1220 [trial court's humorous reference to "Gertrude Rubenstein," an allusion to a line in a Gertrude Stein poem, "Sacred Emily," was merely an "ill-advised attempt to interject some levity in the proceedings" but did not convey to the jury the message the judge did not believe the witness's testimony].)

In yet another exchange between the court and Dr. Goodman, Dr. Goodman testified Diaz had been unable to complete the Minnesota Multiphasic Personality Inventory (MMPI), a diagnostic questionnaire with 567 questions. When Diaz's counsel asked whether Dr. Goodman had formulated an opinion why she had not completed the test, the court sustained a defense objection on foundation and relevance grounds.[6] After Diaz's counsel argued the objection was improperly sustained, the court interjected its own question: "Just too many questions for her, right? She couldn't focus that well?" Dr. Goodman agreed and contrasted it with Diaz's earlier responses in 2007 when she was actually able to finish the test. The court stated, "She deteriorated; she got older, right . . . ? Happens to the best of us." Diaz did not object.

This exchange was also improper. While a court may examine a witness, the court's questions and comment risked conveying to the jury that the court had formed its

---

6     Diaz does not challenge this ruling and, accordingly, we do not consider it.

18

own view as to the reason Diaz did not complete the test. (See generally *People v. Sturm, supra,* 37 Cal.4th at pp. 1237-1238 [in conducting trials, judges "'should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one side or the other'"]; accord, *Haluck v. Ricoh Electronics* (2007) 151 Cal.App.4th 994, 1002.) Nevertheless, it is not reasonably probable the damage award would have been different had the comments not been made. (See *Delzell v. Day* (1950) 36 Cal.2d 349, 351-352 [reversal for judicial misconduct in civil case not required unless it is reasonable probable that there would have been a result more favorable to appellant in the absence of the asserted misconduct].) There was no dispute that Diaz's depression had worsened in recent years and that it, coupled with her age, had affected her ability to do many tasks, including completing several diagnostic questionnaires, one of which was the MMPI. The dispute at trial was directed not to the existence of her depression and its debilitating effect on her life, but the cause of that depression. Neither the court's questions, nor Dr. Goodman's reply, was directed to that causation issue.

Diaz also contends the court disparaged Dr. Goodman's opinion concerning Diaz's level of functionality prior to the accident: When Diaz's counsel asked Dr. Goodman whether he had an opinion as to whether the accident had caused her current medical problems, Dr. Goodman replied, "She was highly functional [prior to the accident.] She was climbing [a] mountain." The court interjected, she was "climbing mountains?" Dr. Goodman explained, "There is a picture of her actually on a mountain or a hill." Defense counsel objected, but before defense counsel could fully articulate the basis for his objection, the court replied, "Come on. Forget that." Diaz's counsel then asked, "Other than the picture I mean."

It is not clear from the record whether the court's statement, "forget that," was directed to the photograph or to defense counsel's objection. Diaz did not attempt to clarify the record on that point. In any event, the net effect of this exchange was simply that the court sustained defense counsel's objection. Diaz does not contend that was error. Even if it were, it does not show bias. (*People v. Fuiava* (2012) 53 Cal.4th 622,

19

732 ["'a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review'"]; *People v. Farley* (2009) 46 Cal.4th 1053, 1110 [same].)

Diaz also claims the court improperly "blamed" Diaz for not seeing a psychiatrist. The court asked Dr. Goodman whether Diaz's primary care physician had referred her to a psychiatrist. Dr. Goodman replied he had not and explained he disagreed with her primary care physician on that point. The court observed that Diaz could always "go on her own, right, if she wanted to?" Dr. Goodman explained most people with Diaz's age and background would not think of seeing a psychiatrist for depression. The court asked Dr. Goodman whether he thought she would ever do so notwithstanding the identification of that need in her life care plan.[7] When Dr. Goodman stated he could not answer that question, the court inquired whether Diaz had seen a psychiatrist after Dr. Goodman had recommended she seek psychiatric treatment for her depression. Dr. Goodman acknowledged she had not. These questions and comments on the evidence were not improper. (Evid. Code, § 775.)

### e. *Diaz's allegations of disparate treatment*

Finally, Diaz asserts the court's bias was reflected in its disparate treatment of her counsel and counsel for the MTA defendants. In particular, she asserts the court often interposed its own sua sponte hearsay objections to Diaz's counsel's questions, but not to similarly framed questions by counsel for the MTA defendants. The examples Diaz cites, however, do not support her charge.

Counsel for the MTA defendants properly asked its expert witness, Dr. Edwin Amos, whether, based on his review of Diaz's medical records, he had an opinion as to the injuries Diaz sustained in the accident. When Diaz's counsel asked Dr. Goodman "what kind of injuries did [Diaz] suffer from this accident?," there was also no objection by either the court or defense counsel. When the court did interject, it was with respect to

_____

[7]    The court stated, "In a life care plan there is no[] thought of making it compulsory, is there? I mean, you can't force a person to go to therapy, can you?"

20

Dr. Goodman's response, which he began by attempting to relay what Diaz had said. The court interrupted the answer, properly telling Dr. Goodman that what Diaz "had said" was hearsay. Diaz's counsel did not reframe the question to allow Dr. Goodman to answer it.

Diaz also contrasts the court's response to a comment by Diaz's counsel and its response to a purportedly similar comment by the MTA defendants' counsel. Dr. Amos testified during cross-examination Diaz "did not mention" having symptoms of dizziness prior to November of 2005. Diaz's counsel stated, "Correct." The court immediately instructed the jury to "disregard counsel's statement of "'correct'" and to draw its own conclusion as to "whether an answer is correct, incorrect, credible or incredible." According to Diaz, when counsel for the MTA defendants made a similar "statement couched in questions" to Merlyn Wilson, Diaz's expert on traffic accidents, the court did not interrupt. The question to Wilson, however, did not include the type of improper comment that drew the court's rebuke.[8] Whether or not it was objectionable as phrased on some other ground, it was not similar to the statement Diaz's counsel made about a witness's answer. There was no disparate treatment.

### f. *Diaz's right to cross-examination*

Diaz contends the trial court interrupted her counsel's examination of witnesses, effectively depriving her of her right to cross-examination. She offers the following example: On direct examination, defense expert Dr. Amos opined that Diaz suffered from diabetic neuropathy causing unsteadiness. On cross-examination, after establishing that there was no indication Diaz had any symptoms of dizziness or falls prior to the

---

8    Counsel for the MTA defendants asked Wilson on cross-examination: "Now when you say that this individual here is 100 percent responsible for his accident, do you take into account that all of a sudden he's confronted with an emergency right in front of him. He's trying to apply the brakes, and he may not know the exact distance he is from the intersection, the exact distance he is from Ms. Arturo's vehicle, the exact speed he's going, the exact speed she's going—that he does not have the ability to take all that into consideration within a couple seconds before you come to the opinion that he did everything wrong?" Diaz did not object.

accident and no record of neuropathy, Diaz's counsel asked: "And it so happened that she had three years of this diabetes. Suddenly she meets—she gets in an accident, on November 21, 2005. She begins experiencing dizzy spells, falling down, loss of balance. Do you think that is consistent with a development of this condition called diabetic peripheral neuropathy?" The court interjected, "The court is going to strike that last question in that it contained a statement of counsel which is not permissible concerning which I have advised him many times. Ask questions. Do not make statements of fact."

While this example more approximates the type of question counsel for the MTA defendants asked Wilson without objection (see fn. 8, above), it is simply a single evidentiary ruling. There are not multiple instances of disparate treatment in this record. As discussed, the court's evidentiary rulings against Diaz do not constitute misconduct. (*People v. Fuiava, supra,* 53 Cal.4th at p. 732 [evidentiary rulings, even if incorrect, not sufficient to show judicial misconduct].) To the extent Diaz asserts the ruling itself was prejudicial error, she offers no argument or citation to the record in support of that contention. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785; *Gunn v. Mariners Church, Inc.* (2008) 167 Cal.App.4th 206, 218 [argument on appeal deemed forfeited by failure to present factual analysis and authority on each point raised]; *Dills v. Redwood Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [appellate court "will not develop the appellants' arguments for them"].)

In sum, the record shows Diaz's counsel had difficulty framing proper questions that conformed to the rules of evidence. The court, at times, apparently lost patience and expressed frustration with Diaz's counsel. Yet, whether considered separately or cumulatively, the court's participation in the questioning at trial did not amount to substantial misconduct that deprived Diaz of a fair trial. (See *People v. Snow* (2003) 30 Cal.4th 43, 78 [The role of a reviewing court "'is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'"]; *People v. Harris, supra,* 37 Cal.4th at p. 347 [same]; see also *Snow,* at p. 78 [court does

not engage in misconduct by reprimanding attorney for ignoring instructions or asking inappropriate questions].)

6. *The Trial Court's Order Granting the Defendants' Motion to Tax Costs on Appeal Requires Modification*

As part of our decision in *Diaz I,* we awarded Diaz her costs on appeal. Following issuance of the remitter, Diaz filed in the trial court a memorandum of costs on appeal totaling $8,232.03. The MTA moved to tax costs contending the cost of printing appellate briefs and associated materials, itemized as $4,155.03 in the costs memorandum, was unreasonable. In support of their motion, the MTA defendants argued the cost to copy pages at a standard copy center is 11 cents per page, which, based on the 1100 pages of documents served and filed (consisting of several copies of the appellate briefs and multi-volume appendix), would amount to $121. In her opposition papers Diaz supplied an itemized invoice from Counsel Press detailing $4,155.03 in charges. The trial court granted the motion to tax costs, observing that several charges included in the invoice, for example, postage and filing fees, were duplicative of costs sought elsewhere. The court concluded only "about $3,000" of the requested $4,155.03 related to "actual printing."[9] Then, without further explanation the court reduced the printing costs to $439.35, striking $3,715.68 from the $4,155.03 Diaz had requested. Diaz contends the court erred in granting the motion to tax costs.[10]

---

[9]     Among the costs related to printing, the invoice also included the following $1,227 in itemized costs:

| | |
|---|---|
| Preparation of Brief (opening) | $495 |
| Preparation of Brief (reply) | $405 |
| Hour Paralegal Time | $ 60 |
| Filing and four service(s) | $155 |
| Federal Express (total) | $ 88 |
| Postage  (total) | $ 24 |

[10]     There appears to be a split in authority whether an order awarding or denying costs is immediately and separately appealable as a post-judgment order or whether, when the order is made following the appellate court's remand, it is properly appealed as a preliminary order in the appeal from the subsequent judgment. (Compare *Barnes v.*

23

We review a trial court's order granting or denying a motion to tax costs for abuse of discretion. (*Seever v. Copley Press, Inc.* (2006) 141 Cal.App.4th 1550, 1557; *Arno v. Helinet Corp.* (2005) 130 Cal.App.4th 1019, 1025.) That is, we will reverse such an order only when the trial court's action is arbitrary, capricious or exceeds the bounds of all reason under the circumstances. (*Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1249-1250.)

When calculating statutorily authorized costs, "'[t]he fact that the brief could have been printed by some other printer, or produced by some other process, at lesser cost is not controlling. The only requirements in this respect are that the cost be actually incurred and that it be reasonable. [Citation.] What is reasonable presents a question of fact . . . ." (*Johnson v. Workers' Compensation Appeals Bd.* (1984) 37 Cal.3d 235, 243 (*Johnson*); accord, *Bank of Idaho v. Pine Avenue Associates* (1982) 137 Cal.App.3d 5, 19 [finding no authority for "proposition that the availability of alternative process made the printing of briefs unreasonable"; in fact court observed all the authorities were to the contrary].)

Here, there is little doubt the court had a sound basis for reducing the printing costs by $1,227 (to $2,928.03) based on the itemized receipt showing some of the costs incurred were unrelated to printing and repetitive of other cost items sought. However, the trial court reduced that amount further without offering any explanation. The only showing made by the MTA defendants was that alternative means were available at a lesser cost, which, as just discussed, is not controlling. (See *Johnson, supra,* 37 Cal.3d at p. 243.) There was no showing the costs invoiced by Counsel Press, to the extent they

*Litton Systems*, *Inc.* (1994) 28 Cal.App.4th 681, 685 [order taxing costs is preliminary to later proceedings and may be challenged in appeal from subsequent judgment] with *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 223 [order denying motion to tax costs is separately appealable as order after final judgment].) In each of the published cases, however, the appeal was allowed. In light of that unifying principle, we decline the MTA defendants' invitation to find the appeal from the order taxing costs untimely.

were dedicated solely to the printing process, were unreasonable.  On this record, the court's order taxing costs for printing and awarding $439.35 was arbitrary.

## DISPOSITION

The order of March 9, 2010 granting the motion to tax costs is reversed, and the trial court is directed to enter a new order granting the motion in the sum of $1,227 and to award Diaz $7,005.03 for costs on appeal in *Diaz I,* an amount which includes $2,928.03 in printing costs.  In all other respects, the judgment is affirmed.  The MTA defendants are to recover their costs on appeal.


PERLUSS, P. J.


We concur:


JACKSON, J.


SEGAL, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.